UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

PAUL F. REBROVICH,

                              Plaintiff,

                -vs-                                    04-CV-046C

COUNTY OF ERIE,
DOUGLAS H. NAYLON, and
DANIEL J. RIDER,

                              Defendants.

_____

APPEARANCES:        THE COSGROVE LAW FIRM (EDWARD C. COSGROVE,
                    ESQ., of Counsel), Buffalo, New York, for Plaintiff.

                    OFFICE OF THE ERIE COUNTY ATTORNEY (KRISTIN
                    KLEIN WHEATON, ESQ., of Counsel), Buffalo, New York,
                    for Defendants County of Erie and Daniel Rider.

                    LIPSITZ GREEN SCIME CAMBRIA, LLP (ROBERT L.
                    BOREANAZ, ESQ., of Counsel), Buffalo, New York, for
                    Defendant Naylon.

## INTRODUCTION

Plaintiff, a former employee of the Erie County Department of Public Works, Division

for Highways, brings this action pursuant to 42 U.S.C. § 1983.  In his complaint, filed

January 23, 2004, he alleged that his immediate supervisor, Senior Highway Maintenance

Engineer Naylon, and the Deputy Commissioner for Highways Rider subjected him to

unjustified disciplinary action and a hostile work environment.  Plaintiff states that he

suffered such stress, ridicule, and embarrassment that his Multiple Sclerosis was

aggravated and he was forced to take sick leave and ultimately resign his position.

On May 23, 2005, plaintiff filed an amended complaint, Item 26, alleging two causes of action under section 1983–the first for the violation of his First Amendment right to political association and the second for the violation of his First Amendment right to free speech. Plaintiff alleges that he was harassed because of his "actual or perceived" political beliefs and support of and friendship with the former County administration (Item 26, ¶ 88) and was retaliated against for speaking out about the unlawful treatment of other employees at the East Aurora Highway Barn and about the illegal and fraudulent activities of the individual defendants during their employment with Erie County.  Item 26, ¶ 101.

On October 11, 2006, the court granted plaintiff's request to extend discovery to take a final deposition, that of Maria Lehman, the Erie County Commissioner of Public Works, during the relevant time period.  Item 46.  At a telephone conference on November 15, 2007, the parties advised the court that the Lehman deposition had been cancelled due to the unexpected illness of plaintiff's counsel and that, because of the late notice, expenses had been incurred by Lehman, a non-party.  Defendants objected to a further continuance and had suggested that the deposition go forward with substitute counsel or on interrogatories.  Plaintiff rejected those suggestions.  In an order dated December 7, 2006, the court instructed defendants to file dispositive motions and, if plaintiff sought to reschedule the Lehman deposition, application should be made pursuant to Fed. R. Civ. P. 56(f).  Item 49.

On March 8, 2007, defendants filed a joint motion for summary judgment.  Item 54. Plaintiff filed memoranda in opposition to the motion, and cross-moved for further discovery.  Items 82-85.  Defendants filed reply memoranda on July 11, 2007.  Items 88, 90.  Oral argument on the motions was heard on July 16, 2007.  For the reasons that

follow, plaintiff's motion for additional discovery is denied, and defendants' motion for summary judgment is granted.

## FACTS[1]

Plaintiff commenced his employment with Erie County in December 1968.  Item 57, Exh. A, p. 12.  At all times relevant to the amended complaint, plaintiff was employed as a General Crew Chief in the Highway Division of the Department of Public Works ("DPW"), and was assigned to the East Aurora Highway Barn ("Aurora Barn").  Defendant Naylon was appointed Senior Highway Maintenance Engineer at the Aurora Barn and became plaintiff's supervisor on approximately November 4, 2000.  *Id.,* p. 24.  Defendant Naylon reported to defendant Rider, who was the Deputy Commissioner of Highways.  Both Naylon and Rider were appointed to their positions with Erie County after Republican candidate Joel Giambra was elected to his position as County Executive.

Plaintiff testified in his deposition that during November and December 2000, Naylon "badgered" him about non-work-related topics–for example, whether plaintiff resented being supervised by a younger person, how other employees reacted to Naylon's appointment, and whether plaintiff was invited to certain social functions hosted by Maria Lehman.  Item 57, Exh. A, pp. 31-33.  Naylon also questioned plaintiff about the personalities, work habits, social connections, and friendships of the employees at the Aurora Barn.  *Id.,* pp. 34, 40.  Naylon asked plaintiff if he had been appointed by the previous County Executive (Dennis Gorski, a Democrat) and whether he was "backed" by

---

[1]  This factual statement is prepared from the parties' Rule 56 statements and the exhibits in support of and in opposition to the motions for summary judgment.

the previous administration. Plaintiff told Naylon that he was not appointed by anyone, was not "backed" by the previous administration, and was not politically active. *Id.,* p. 35. Naylon told plaintiff that he was a close personal friend of Joel Giambra, and that the new administration would eventually get their "own people in here." *Id.* Naylon also told plaintiff that he would have to "get onboard or pay the consequences." *Id.* Plaintiff testified that Naylon instructed him to make a list of the "good" employees at the Aurora Barn, then singled those employees out for disciplinary action and transfer. Item 57, Exh. A, p. 36.

Plaintiff testified that Naylon perceived plaintiff to be part of the "old regime." Item 57, Exh. A, p. 67. Naylon emphasized the fact that he had political power as a friend of Giambra and that plaintiff was not "part of the team." *Id.,* p. 50. However, when Naylon talked about the Aurora Barn employees being part of the "old regime," he did not specifically mention Mr. Gorski's name. *Id.,* p. 59. Plaintiff testified that Naylon did not ask him to contribute to a political campaign or attend a political fundraiser. *Id.,* p. 53. At the time, plaintiff was a registered Republican, as were Naylon and Rider. *Id.,* p. 54; Exh. C, p. 71; Exh. I, p. 34.

Plaintiff testified that he never attended a meeting with defendant Rider. Item 57, Exh. A, p. 55. He met Rider during the summer of 2000 at a flooded road in Orchard Park, New York, but had no personal contact with Rider other than casual greetings or telephone conversations regarding work issues. *Id.,* p. 56. Plaintiff never had a political discussion with Rider, nor was he asked by Rider to contribute to a political campaign or attend a political fundraiser. *Id.,* p. 57.

On December 6, 2000, Naylon gave plaintiff an oral warning "not to yell, berate or harass employees in front of all other employees."  Item 57, Exh. Q.  Additional oral warnings were given to plaintiff during the weeks of December 12-18, 2000 and December 25, 2000 in response to complaints about the plowing of Route 240.  *Id.*  On January 8, 2001, Naylon issued a written warning to plaintiff for disobeying "a direct order to stop and see me before [he] leave[s] . . . ."  *Id.*

Defendant Rider testified that during the fall of 2000, he received citizens' complaints about the plowing of Route 240 and forwarded the complaints to Naylon. Item 57, Exh. J, ¶ 15.  Naylon accused plaintiff of insubordination when plaintiff tried to explain why only one side of Route 240 had been plowed.  Item 57, Exh. A, p. 49; Item 57, Exh. J, ¶ 15.  Rider also received complaints about the distribution of overtime at the Aurora Barn, and instructed Naylon to "straighten out the overtime issues."  *Id.,* Exh. J, ¶ 16.  Rider was copied on a memorandum issued by Naylon to several individuals, including plaintiff, directing them to follow union procedures in awarding overtime.  *Id.,* ¶ 17.  On January 23, 2001, Naylon gave plaintiff a memorandum advising him that his performance was deficient and listing the various disciplinary actions taken in the previous month.  Item 57, Exh. Q.  Plaintiff left work on sick leave that day.  *Id.,* Exh. A, p. 69.

In December 2000, plaintiff contacted his union steward, who set up a meeting between plaintiff and an agent of the Federal Bureau of Investigation ("FBI").  The agent visited plaintiff at his home, and plaintiff discussed what he perceived to be illegal actions by Naylon, including the operation of a private business out of Naylon's County office.  Item 57, Exh. A, p. 92.  FBI records indicate that this meeting took place on January 18, 2001. Item 57, Exh. R (filed under seal).

5

Rider stated in a declaration that while plaintiff was on sick leave, he received several grievances about the distribution of overtime at the Aurora Barn.  Item 57, Exh. J, ¶ 19.  Rider was told by another employee that plaintiff was in possession of County records relating to overtime and had taken them to his home while on leave.  *Id.*   In approximately February 2001, Naylon telephoned plaintiff's home on two occasions, asking him to come to the office to discuss the overtime issue.  Plaintiff refused on medical grounds.  *Id.,* Exh. A, pp. 70-71.  Rider sent plaintiff a letter dated March 23, 2001 requesting that plaintiff appear at a hearing at his office to discuss the missing County property.  *Id.,* Exh. M.  Plaintiff did not respond.  *Id.,* Exh. J, ¶ 20.  On May 29, 2001, Rider sent another letter asking that plaintiff appear at his office on June 19, 2001 to discuss the missing County property.  *Id.,* Exh. L.  Again, plaintiff did not respond.  *Id.,* Exh. J, ¶ 23.  Plaintiff was aware that Rider was referring to overtime records, but took the position that as he was on sick leave he was not obligated to come into work.  *Id.,* Exh. A, p. 72.  Plaintiff explained that he kept track of overtime distribution with his own personal reference sheets and had not taken any County time sheets or other property home with him.  *Id.,* pp. 72-73.

In May 2001, letters were sent to Steven Pigeon, then-Chairman of the Erie County Democratic Party, and the New York State Attorney General's Office signed by "Concerned Erie County employees (and voting taxpayers)" and asking for an investigation into corruption and incompetence in County government.  Item 57, Exhs. S, T.  Plaintiff participated in the writing of these letters, but did not "have a big part in drafting these letters . . . ."  *Id.,* Exh A, p. 124.

On July 5, 2001, plaintiff exhausted his sick leave and submitted his letter of resignation. Item 85, Exh. M. On June 11, 2001, he applied for New York State disability benefits due to "Multiple Sclerosis complicated by work related stress." *Id.,* Exh. O. County records indicate that a request for information was received from the New York State Employees' Retirement System by Erie County on October 1, 2001. Item 57, Exh. V. That information was transmitted to the State on October 23, 2001. *Id.,* Exh. X. The New York State Retirement System questioned the amount of overtime hours worked by plaintiff and plaintiff responded to this inquiry on November 12, 2001, acknowledging that Erie County had previously sent payroll records to the State. *Id.,* Exh. Y. New York State forwarded a second request for information to the County which was dated November 28, 2001 and the documentation was transmitted on December 6, 2001. *Id.,* Exh. Z. In a letter dated May 29, 2002, New York State requested that plaintiff undergo a psychiatric evaluation. *Id.,* Exh. AA. This evaluation took place on August 12, 2002. On October 3, 2002, New York State requested further information from a physician who examined plaintiff on March 26, 2002. *Id.,* Exh. BB. A final independent medical examination of plaintiff took place on December 13, 2002. *Id.,* Exh. A, p. 112. Plaintiff received disability benefits in February 2003, retroactive to July 2001. *Id.,* Exh. A, p. 113.

In February 2003, plaintiff wrote to Erie County Comptroller Nancy Naples regarding his concerns about Naylon. Item 57, Exh. U. Rider and Naylon both stated that they were unaware that plaintiff had contacted any law enforcement agencies regarding the Aurora Barn or alleged illegal activities associated with their employment with Erie County. Item 57, Exh. F, ¶ 12; Exh. J, p. 26.

**DISCUSSION**

**1.  Plaintiff's Cross Motion for Additional Discovery**

Plaintiff has cross-moved for additional discovery under Fed. R. Civ. P. 56(f).  He claims that it is essential that he take the deposition of Maria Lehman because she was "at the top of the chain of command at the Erie County Department of Public Works . . . [and] was ultimately responsible for the acts of defendants Rider and Naylon."  Item 82, ¶ 15.  Additionally, plaintiff states that Ms. Lehman was present at a meeting at which issues at the Aurora Barn were discussed, and "actively contributed to disciplinary and policy-making decisions."  *Id.*, ¶ 16.  Plaintiff states that disciplinary actions against him commenced following this meeting and seeks information regarding "any interactions she had with defendants Rider and Naylon regarding the discipline of [plaintiff]."  *Id.*, ¶ 18.

Where the party opposing summary judgment contends that additional discovery is required, a court may deny summary judgment or order a continuance to permit the party to obtain the discovery.  *See* Fed.R.Civ.P. 56(f).  A party seeking additional discovery must present his or her contention that the additional discovery is needed by affidavit, and "[t]his Circuit has established a four-part test for the sufficiency" of such an affidavit.  *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994).  The Rule 56(f) affidavit must include:  (1) the nature of the uncompleted discovery; (2) how the facts sought reasonably are expected to create a genuine issue of material fact; (3) what efforts the affiant has made to obtain those facts; and (4) why those efforts were unsuccessful.  *See id.* at 1138.  "Rule 56(f) is not a shield against all summary judgment motions.  Litigants seeking relief under the rule must show that the material sought is germane to the defense, and that it

is neither cumulative nor speculative . . . ." *Id.* at 1138 (internal quotation marks and citations omitted).

In opposition to the motion, defendants state that plaintiff has not met the applicable standards for additional discovery under Rule 56(f).  Lehman is not a party, is not accused of having taken any discriminatory action against plaintiff, and cannot be held vicariously liable for the acts of Naylon and Rider.  There is no evidence that she played any role in any illegal or unwarranted disciplinary actions against plaintiff.  In December 2000, Ms. Lehman was apparently present for about ten minutes at a meeting between Naylon and Rider in Rider's office, at which issues regarding the Aurora Barn were discussed, but Naylon testified that he did not recall the mention of any specific individuals.  Item 89, Exh. B. Additionally, Rider testified that he discussed disciplinary or personnel maters with the Director of the Erie County Department of Labor Relations, not Ms. Lehman.  Item 89, Exh. C.  There is nothing in the record to suggest that Lehman had any input into disciplinary matters concerning plaintiff or that she played any role in the alleged harassment or constitutional violations.

Plaintiff has failed to indicate any specific discoverable information that he seeks to obtain from a deposition of Ms. Lehman which would raise a material issue of fact sufficient to overcome the defendants' motion for summary judgment.  *See Mason Tenders Dist. Council Pension Fund v. Messera*, 958 F. Supp. 869, 894 (S.D.N.Y. 1997) ("[A] court can reject a request for discovery, even if properly and timely made through a Rule 56(f) affidavit, if it deems the request to be based on speculation as to what potentially could be discovered.") (quoting *Paddington Partners v. Bouchard*, 34 F.3d at 1138).  Accordingly,

plaintiff's motion for additional discovery is denied, and the court will proceed to determine the motion for summary judgment.

## 2. Motion for Summary Judgment

Defendants set forth several arguments in support of their motion for summary judgment. Specifically, the defendants contend that plaintiff has failed to present evidence that he engaged in constitutionally protected political expression or speech, that the defendants were aware of the alleged political expression or speech, or that there is any causal connection between the challenged actions and plaintiff's political affiliation or speech. Defendants also argue that there were legitimate non-discriminatory reasons for their actions. Additionally, defendants contend that plaintiff has failed to show personal involvement in the alleged constitutional violations on the part of defendant Rider or the existence of a municipal policy so as to hold the County liable for the alleged actions of the individual defendants.

Plaintiff alleges that the defendants violated his rights under the First Amendment by harassing him and retaliating against him. Specifically, he contends that the defendants violated his right to political association by "attempting to turn a non-political work-site . . . into a political scene  where employees were required to declare their allegiance to [County Executive] Joel Giambra." Item 83, section III, A.[2]  Additionally, plaintiff contends that following his constitutionally protected speech regarding the defendants' actions, he was subjected to unwarranted discipline, making it necessary for him to take sick leave and disability retirement.

---

[2]  Plaintiff's Memorandum of Law, Item 83, is not paginated.

### A.  Summary Judgment Standard

Pursuant to Rule 56, summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *SCS Communications, Inc. v. Herrick Co.*, 360 F.3d 329, 338 (2d Cir. 2004).  The court will not try issues of fact on a motion for summary judgment, but rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case.  When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (internal citations omitted).  If, however, "'as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'"  *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004) (quoting *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.), *cert. denied,* 517 U.S. 1190 (1996)).

The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in

favor of the party opposing the motion.  *Bickhardt v. Ratner*, 871 F. Supp. 613 (S.D.N.Y. 1994) (citing *Celotex, supra)*. Thus, "[s]ummary judgment may be granted if, upon reviewing the evidence in the light most favorable to the nonmovant, the court determines that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."  *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir.1993).

## B.  Statute of Limitations

At the outset, defendants have raised the defense of statute of limitations.  Plaintiff filed this action on January 23, 2004, subject to a three-year statute of limitations.  *See Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004); *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994), *cert. denied,* 516 U.S. 808 (1995).  Accordingly, any alleged retaliatory acts that occurred before January 23, 2001 are not timely and may not be considered by the court unless there is some basis to expand the limitations period.

Plaintiff argues that all defendants engaged in a course of continuous conduct between November 2000 and March 2003 which caused plaintiff serious harm and asks that the court consider timely all acts of the defendants that occurred prior to January 23, 2001 under the continuing violation doctrine.  Specifically, plaintiff alleges that Naylon harassed him from November 2000 through January 2001 with his interrogations, flaunting of political power and unwarranted discipline.  He further alleges that the harassment continued with Rider's accusatory letters in 2001 and the interference with his disability application.

The continuing violation doctrine "allows a plaintiff in certain circumstances to recover on the basis of an ongoing policy or practice of illegal activity initiated prior to the

limitations period." *Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 118 (2d Cir. 1997). When a claim is based on a continuing violation, the commencement of the statute of limitations period may be delayed until the final act of discrimination in furtherance of the illegal or practice. *Washington v. County of Rockland*, 373 F.3d 310, 317 (2d Cir. 2004). While the doctrine originated in the context of employment discrimination actions, courts in the Second Circuit have applied it to a wide variety of section 1983 claims. *See, e.g., Cornwell v. Robinson*, 23 F.3d 694, 703-04 (2d Cir. 1994): *Young v. Strack*, 2007 WL 1575256, at *4-5 (S.D.N.Y. May 29, 2007) (First Amendment, Fourteenth Amendment, and Eighth Amendment claims). The continuing violation doctrine is generally viewed with disfavor in the Second Circuit and should be applied only on a showing of compelling circumstances. *McFadden v. Kralik*, 2007 WL 924464, at *7 (S.D.N.Y. March 28, 2007); *Curtis v. Airborne Freight Corp.*, 87 F. Supp. 2d 234, 244 (S.D.N.Y. 2000). Courts have found compelling circumstances where "the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy [that is] alleged to be discriminatory; or where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness." *Remigio v. Kelly*, 2005 WL 1950138, at *8 (S.D.N.Y. August 2, 2005) (quoting *Yip v. Bd. of Trs. of State Univ. of N.Y.*, 2004 WL 2202594, at *4 (W.D.N.Y. September 29, 2004)) (internal quotation marks omitted).

The mere fact that wrongful acts may have a continuing impact is not sufficient to find a continuing violation. *Blankman v. County of Nassau*, 819 F. Supp. 198, 207 (E.D.N.Y. 1993) (citing *Delaware State College v. Ricks*, 449 U.S. 250, 257 (1980)

13

(continuing violation cannot be based on the continuing effects of earlier unlawful conduct). While plaintiff has alleged numerous and ongoing acts of harassment by Naylon from November 2000 until January 23, 2001, he has failed to show the requisite compelling circumstances necessary to apply the continuing violation doctrine. Plaintiff was aware of each act of alleged harassment and the date it occurred, and has failed to show an openly espoused policy of illegality. Accordingly, the court will not consider the alleged acts of harassment that occurred prior to January 23, 2001. The court also notes that plaintiff has not alleged any acts on the part of defendants Rider or Erie County that occurred prior to January 23, 2001.

### C. Claims against Defendant Rider

Plaintiff brings this action pursuant to 42 U.S.C. § 1983. "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d. Cir. 1997) (citing *Eagleston v. Guido, supra).* Plaintiff alleges that defendants Rider and Naylon were appointees of County Executive Joel Giambra and "were selected to carry out a pattern of patronage hirings" by the County Executive. Plaintiff states that defendants assumed he was not a supporter of the new County Executive, and harassed him based on a perceived political association with the former administration. Without any proof, plaintiff argues that Naylon and Rider acted in concert, and asks the court to consider the acts of Naylon to be those of Rider as well. With specific regard to Rider, plaintiff claims that Rider sent him letters in March,

14

April, and May 2001 asking that he report to Rider's office to resolve an issue of missing County property.  Plaintiff had no conversations with Rider regarding his political beliefs or affiliation, was never asked to contribute to a political campaign or attend a political fundraiser, and in fact had only limited contact with Rider.  Rider did not directly supervise plaintiff, and his office was located in downtown Buffalo, not at the Aurora Barn.  Plaintiff also alleges, in a conclusory fashion, without admissible evidence in support, and contrary to the evidence in the record, that Rider delayed plaintiff's disability application.  The record demonstrates that the day-to-day harassment of which plaintiff complains, including the "interrogations," flaunting of political power, and unwarranted discipline, was perpetrated by Naylon alone.

An individual cannot be held liable for damages under section 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation.  *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Personal involvement can be shown by evidence that:  (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring.  *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

The only acts alleged to have been committed by Rider include the mailing of certified letters to plaintiff in March, April, and May 2001 asking him to appear for a hearing

regarding missing County property and the alleged interference with the disability application.   Rider testified that he received grievances regarding the distribution of overtime at the Aurora Barn and had been told that plaintiff had taken overtime records to his home when he left work on sick leave in January 2001.   Plaintiff refused to communicate with Naylon or Rider regarding the overtime issue, although he knew that Rider sought the overtime records.   It was plaintiff's position that the records were his personal property and that he was not obligated to appear at the hearing, even though he admitted that the records would have been helpful to the resolution of the issue.

Plaintiff has offered no proof that Rider's mailing of these letters to plaintiff, after plaintiff left his position on sick leave never to return to the Aurora Barn, violated or interfered with plaintiff's First Amendment rights to free speech or association.   The evidence indicates that Rider had a legitimate reason to believe that plaintiff was in possession of County property, and plaintiff made no effort to inform him otherwise.   Even if plaintiff viewed Rider's actions as "harassment," plaintiff was not prevented from the free association or expression of his political ideas.   With regard to the disability application, the admissible evidence in the record indicates that the responsible Erie County employees promptly responded to all requests for information by the New York State Employees Retirement System and that plaintiff's application was delayed by multiple independent medical examinations requested by New York State.   Plaintiff has offered no admissible proof that his application was delayed by any actions of the defendants or any other employees of Erie County.   Accordingly, plaintiff has failed to allege a constitutional violation of plaintiff's First Amendment right to political association by Rider.

To the extent that plaintiff argues that the letters were mailed in retaliation for plaintiff's exercise of protected speech, there is no causal connection between the letters and the exercise of protected speech.   To state a First Amendment retaliation claim asserted under 42 U.S.C. § 1983, a  plaintiff must establish "that  (1) the expression at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected his constitutionally protected expression, and (3) a causal relationship existed between the constitutionally protected expression and the retaliatory action." *Camacho v. Brandon,* 317 F.3d 153, 160 (2d Cir. 2003).   Even if the court assumes for purposes of the motion that plaintiff engaged in protected speech, the only contact plaintiff had with authorities prior to Rider's mailing of the letters was a meeting with agents of the FBI on January 18, 2001, at which time plaintiff's identity was protected.[3]   Rider testified that he was unaware of plaintiff's conversation with agents of the FBI, and the letters from the "Concerned Erie County employees" to the Attorney General's office and the Democratic Chairman in May of 2001 were not signed by or attributable to plaintiff.   Plaintiff's lack of knowledge as to whether Rider knew of his protected speech with authorities is not sufficient to raise a genuine issue of fact.   Additionally, Rider stated that he did not mail the letters to plaintiff so as to harass him, and plaintiff admitted that he did not know Rider's motivation.

To the extent that plaintiff seeks to hold Rider liable for the harassment perpetrated by Naylon, plaintiff has offered no proof that Rider established a municipal policy of unconstitutional harassment or failed to remedy a constitutional violation that was brought

---

[3] Plaintiff also states that he complained to Naylon about Naylon's actions and complained to his union steward, who set up the meeting with the FBI.  Significantly, plaintiff does not state that he complained to Rider.

to his attention.   Accordingly, there is no basis upon which to hold Rider liable for a violation of section 1983, and the claims against Rider are dismissed.

### D.  Claims against Erie County

In order to sustain a section 1983 claim against a municipality, the act that caused the violation of rights must have been committed pursuant to an official policy or custom. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 691-94 (1978).   Further, "[t]he official policy must be the 'moving force of the constitutional violation.'"   *Goldberg v. Town of Rocky Hill,* 973 F.2d 70 (2d Cir. 1992) (quoting *Monell*, 436 U.S. at 694).   While a municipality can be held liable for a constitutional violation asserted in a claim under section 1983, liability cannot rest on a theory of respondeat superior.   *Jeffes v. Barnes,* 208 F.3d 49, 56-57 (2d Cir.), *cert. denied,* 531 U.S. 813 (2000) (citing *Monell,* 436 U.S. at 694).   In fact, avoiding results that are indistinguishable from respondeat superior appears to be a primary concern of Supreme Court jurisprudence on municipal liability. *See, e.g., St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (plurality opinion) ("If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability.").

Where the act did not result from official municipal policy, the municipality may still be held liable where the injury is caused by one of its lawmakers or "'by those whose edicts or acts may fairly be said to represent official policy.'"   *Jeffes,* 208 F.3d at 57(quoting *Praprotnik*, 485 U.S. at 121-22).

18

> Where the contention is not that the actions complained of were taken pursuant to a local policy that was formally adopted or ratified, but rather that they were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved.

*Id.* Plaintiff has offered no proof of either a municipal policy to violate the First Amendment rights of employees of the Aurora Barn or that Naylon or Rider were policymakers whose decisions could be said to reflect official Erie County policy. Accordingly, there is no basis to impute liability to the County, and the claims against Erie County are dismissed.

### E.  Claims against Defendant Naylon

Plaintiff alleges that he was harassed by Naylon in violation of his First Amendment right to political association and was retaliated against because he was not aligned with the Giambra administration.   Specifically, plaintiff alleges that Naylon questioned and interrogated him regarding the employees at the Aurora Barn, flaunted his political connections with the County administration, and subjected him to unwarranted discipline. To the extent that plaintiff also alleges that Naylon improperly delayed his disability application, the record indicates that none of the defendants delayed the application, and the court does not find this to be an act of harassment or retaliation in violation of the First Amendment.   Additionally, the court notes that in assessing the actions of defendant Naylon, only those  actions which occurred on or after January 23, 2001 are timely for purposes of the statute of limitations.   Thus, plaintiff's allegations regarding Naylon's alleged harassment during November and December 2000 will not be considered.

Government employees who are not policymakers have the right not to affiliate with or support a particular party or faction as a condition of employment.  *See Rutan v.*

*Republican Party of Illinois*, 497 U.S. 62, 69 (1990) ("[C]onditioning public employment on the provision of support for the favored political party 'unquestionably inhibits protected belief and association'" (quoting *Elrod v. Burns*, 427 U.S. 347, 359 (1976) (plurality opinion))).  Plaintiff argues that Naylon harassed him, threatened his job security, and subjected him to unwarranted discipline based on a perceived political affiliation with the previous administration.  Most of these actions occurred in November and December 2000, and thus are untimely.  To the extent that Naylon served plaintiff with a memorandum on January 23, 2001 detailing various disciplinary actions taken against plaintiff during December 2000, the court will consider plaintiff's claim that he was subjected to unwarranted discipline in retaliation for his protected First Amendment activity.  However, plaintiff has failed to offer proof that he participated in any protected associational activity. Plaintiff admits that he was a registered Republican, as were Naylon and Giambra, and stated that he was not politically active.  There is no proof that Naylon required the employees of the Aurora Barn to take an oath of allegiance to County Executive Joel Giambra, and plaintiff has admitted that he was never asked to contribute to a political campaign or attend a political fundraiser.  Although Naylon warned plaintiff that he would have to "get onboard" with the new administration or suffer the consequences, the court can only conclude that what was meant by the direction to "get onboard" with the new administration was for the employees of the Aurora Barn to follow the direction of the new supervisor and do their jobs as their superiors saw fit.  There is no proof that by this direction Naylon hindered plaintiff's right to free political association.

With regard to plaintiff's claims that defendant Naylon violated his First Amendment right to freedom of expression, it is well settled that "[p]ublic employees do not surrender their First Amendment rights to comment on matters of public interest by virtue of their

20

acceptance of government employment." *Cobb v. Pozzi*, 363 F.3d 89, 101 (2004). Nevertheless, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers*, 461 U.S. 138, 147 (1983). While the determination of whether speech constitutes a matter of public concern "may be somewhat fact-intensive, it presents a question of law for the court to resolve." *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003).

"Under the public concern doctrine, when 'expression cannot be fairly considered as relating to any matter of political, social or other concern to the community,' but is simply a personal matter, it is not afforded First Amendment protection." *Garcia v. S.U.N.Y. Health Sciences Center,* 280 F.3d 98, 105-06 (2d Cir. 2001) (quoting *Connick v. Myers,* 461 U.S. at 146). Thus, where complaints are "personal in nature" and "generally relate[ ] to [the employee's] own situation," the public concern requirement has not been satisfied. *Ezekwo v. New York City Health & Hospitals Corp.*, 940 F.2d 775, 781 (2d Cir.), *cert. denied,* 502 U.S. 1013 (1991).

Plaintiff alleges that he spoke out about Naylon's treatment of the employees at the Aurora Barn and Naylon's illegal activities. The court finds that the complaints regarding conditions at the Aurora Barn, including the discipline and transfer of certain employees, were matters of personal interest and do not constitute protected speech. "Speech that relates primarily to matters of personal interest or internal office affairs, in which the individual speaks as an employee rather than as a citizen, cannot support a First Amendment claim." *Collins v. Christopher*, 48 F. Supp. 2d 397, 408 (S.D.N.Y. 1999) (citing

*Saulpaugh v. Monroe Community Hospital*, 4 F.3d 134, 143 (2d Cir. 1993), *cert. denied,* 510 U.S. 1164 (1994)).  In contrast, plaintiff's statements to the FBI regarding Naylon's illegal activities constitute matters of public concern as they involved the alleged misuse of County resources.

To prevail on a First Amendment retaliation claim asserted under 42 U.S.C. § 1983, a  plaintiff must establish "that  (1) the expression at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected his constitutionally protected expression, and (3) a causal relationship existed between the constitutionally protected expression and the retaliatory action."  *Camacho v. Brandon,* 317 F.3d 153, 160 (2d Cir. 2003).  Assuming for purposes of the motion that plaintiff engaged in protected speech to the FBI in January 2001, he has failed to offer proof of a causal relationship between the protected speech and any retaliatory action taken by Naylon.  Plaintiff's meeting with the agents of the FBI took place on January 18, 2001, following the disciplinary warnings issued by Naylon in December 2000.   On January 23, 2001, plaintiff received a memorandum reiterating those warnings and left work on sick leave.  There is no proof that Naylon had any knowledge of plaintiff's meeting with the FBI, and Naylon has specifically denied such knowledge.  As stated previously with regard to defendant Rider, plaintiff's lack of knowledge as to Naylon's motives does not raise a genuine issue of material fact regarding those motives.  The only other actions taken by Naylon after January 23, 2001 were two telephone calls asking plaintiff to come to the Aurora Barn to discuss the overtime issue.   Thus, plaintiff suffered no adverse retaliatory action following his expression of protected speech.  Accordingly, Naylon's motion for summary judgment dismissing the complaint is granted.

**CONCLUSION**

Plaintiff's motion for additional discovery is denied, and defendants' motion for summary judgment is granted.  The complaint is dismissed, and the Clerk is directed to enter judgment in favor of defendants.

So ordered.

_____\s\ John T. Curtin_____
JOHN T. CURTN
UNITED STATES DISTRICT JUDGE


Dated: February   14    , 2008
p:\pending\2004\04-46.dec1007